IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| ROBERT DAVID GILLESPIE, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 122-128 |
| | ) | |
| LT. S. YOUNG; DEPUTY MOSLEY; | ) | |
| DEPUTY MILLER; and DEPUTY SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Plaintiff, currently incarcerated at Riverbend Correctional Facility in Milledgeville, Georgia, is proceeding *pro se* and *in forma pauperis* ("IFP") in this civil rights case filed pursuant to 42 U.SC. § 1983 concerning events alleged to have occurred at the Columbia County Detention Center ("CCDC") in Appling, Georgia. Defendants move for summary judgment. For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED**, (doc. no. 50), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

**I.     PROCEDURAL BACKGROUND**

Plaintiff submitted his amended complaint on February 15, 2023, and because he is proceeding IFP, the Court screened the amended complaint and found Plaintiff had arguably stated a viable excessive force claim against Defendants Young, Mosley, Miller, and Smith. (Doc. nos. 21, 26.) The Court recommended dismissal of all other defendants and claims, as well as Plaintiff's official capacity monetary damage claims. (Doc. no. 24.) Chief United

States District Judge J. Randal Hall adopted the recommendation as the opinion of the Court on May 15, 2023.  (Doc. no. 34.)  All four Defendants filed their answers by August 17, 2023, and the Clerk of Court issued a Scheduling Notice setting deadlines for the case.  (Doc. nos. 20, 22-23, 35, 47.)  Defendants twice requested extensions of time to file motions, which the Court granted.  (Doc. nos. 42, 49.)  The case proceeded through the discovery period, during which Defendants took Plaintiff's deposition.  (Doc. no. 55-1, "Gillespie Dep.")

Consistent with the case deadlines, Defendants filed a motion for summary judgment on September 29, 2023.  (Doc. no. 50.)  At that time, the Clerk of Court issued a notice concerning the summary judgment motion and the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of failing to comply with the requirements for responding.  (See doc. no. 54.)  On October 24, 2023, when Plaintiff failed to respond, the Court again explained the rights and requirements associated with responding and extended Plaintiff's time to respond to Defendants' motion.  (Doc. no. 56.)

On October 25, 2023, Plaintiff filed a one-page response, "object[ing]" to Defendants' motion for summary judgment.  (Doc. no. 57.)  Due to the timing of this filing and a change of Plaintiff's address, Plaintiff's response was filed without the benefit of the instructions in the Court's October 24th Order, so the Court directed the Clerk to re-serve the October 24th Order on Plaintiff at his new address, and again extended the deadline for Plaintiff to respond to Defendants' motion for summary judgment.  (Doc. no. 58.)  Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.[1]

---

[1] The Court also explained summary judgment motions, along with the rights and requirements associated with responding, in its December 5, 2022 Order screening Plaintiff's original complaint.  (Doc. no 11, pp. 8-9.)

Plaintiff then filed a sworn "Opposition to Defendants Motion for Summary Judgment" on November 6, 2023, in which he acknowledged receipt of the Court's October 24th Order. (Doc. no. 59.)  Defendants timely filed a reply. (Doc. no. 62.)

In accordance with Local Rule 56.1, Defendants submitted a Statement of Material Facts ("SMF") in support of their summary judgment motion. (Doc. no. 52.)  Although Plaintiff filed two responses in opposition to Defendants' summary judgment motion, these filings do not respond to each fact in Defendants' Statement of Material Facts and consist of conclusory allegations, most of which are inadmissible evidence for purposes of opposing the motion for summary judgment.  See Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005) (requiring consideration of only admissible evidence when ruling on motions for summary judgment); see also Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (finding summary judgment appropriate where inmate produced nothing beyond "his own conclusory allegations" challenging actions of defendant); Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of party's own conclusory allegations is not sufficient to oppose summary judgment.").  Regardless, the Court will consider, where appropriate, Plaintiff's responses.  Moreover, the record includes a video of the disputed incident. (Doc. no. 51-10, Ex. 1, "Video.")  The Court deems admitted all portions of Defendants' statements having evidentiary support in, and not otherwise contradicted by, the record and which are not properly opposed by Plaintiff as contemplated under Federal Rule of Civil Procedure 56.[2]  See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th

---

[2] Federal Rule of Civil Procedure 56 requires a party disputing a fact to cite "to particular parts of materials in the record," and an affidavit or declaration used to oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(1) & (4).

3

Cir. 2011) (*per curiam*) (finding no error in deeming defendants' material facts admitted where *pro se* prisoner failed to respond with specific citations to evidence and otherwise failed to state valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000) (same).

However, this does not automatically entitle Defendants to summary judgment because as the movant, Defendants continue to "shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact." Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). Moreover, the Court is mindful it "must construe the facts and draw all inferences in the light most favorable to the nonmoving party and 'when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.'" Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006) (quoting Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005)).) Thus, the Court will review the record, including the video of the incident, Plaintiff's sworn deposition testimony, and any factually supported opposition to the SMF, "to determine if there is, indeed, no genuine issue of material fact." Mann, 588 F.3d at 1303; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010) (*per curiam*) (explaining where party's version of facts obviously contradicts video, court accepts video depiction).

## II. FACTUAL BACKGROUND

The events giving rise to this lawsuit occurred while Plaintiff was a pretrial detainee at CCDC in July 2021. (SMF ¶ 1; see generally doc. no. 21.) At that time, Defendants were jail officials at CCDC. (Doc. no. 51-3, "Mosley Aff.," ¶ 2; doc. no. 51-4, "Young Aff.," ¶ 2; doc. no. 51-5, "Smith Aff.," ¶ 2; doc. no. 51-6, "Miller Aff.," ¶ 2.)

### A. Plaintiff's Arrest and Intake at CCDC

On July 17, 2021, Plaintiff was arrested and transported to CCDC for booking. (SMF ¶¶ 3, 5.) At CCDC, Plaintiff was housed in a holding cell for the first three days of his detainment and was placed on an alcohol detox protocol. (SMF ¶¶ 6, 8.) Plaintiff had an aluminum cane for a knee injury, which he was permitted to keep with him upon his arrival at CCDC. (SMF ¶ 10.) Plaintiff's attempts to make bond were unsuccessful. (SMF ¶ 7.)

After three days in the holding cell, Plaintiff was moved to cell 1 in A-Pod at CCDC. (SMF ¶ 9.) On the evening of July 21, 2021, Nurse Lynn Witt gave Plaintiff ibuprofen, which Plaintiff is highly allergic to. (SMF ¶¶ 9-10.) When Plaintiff realized he had taken ibuprofen, he alerted Nurse Witt of his allergy and Nurse Witt administered a dose of Benadryl to Plaintiff using a syringe to counteract Plaintiff's allergic reaction. (SMF ¶¶ 13-14.)

Plaintiff contends the Benadryl was "not the stuff you buy in a store," rather, it was a "hallucinogenic narcotic . . . about 6,000 times more potent" than over-the-counter Benadryl. (Gillespie Dep., p. 33; see also SMF ¶ 15.) As a result, Plaintiff hallucinated for five to seven days. (SMF ¶ 16.) Plaintiff has no memory of any events that occurred during this five- to seven-day period and describes the time as "a total blank." (SMF ¶¶ 17-18.)

### B. The July 22, 2021 Incident

Plaintiff's use of force and failure to intervene claims arise out of an incident that took place on July 22, 2021, while Plaintiff was hallucinating as a result of the medication he was provided on July 21st. These events were recorded by a video camera across from Plaintiff's cell in A-Pod. (Doc. no. 51, p. 18.) Therefore, the Court first recounts the events depicted on the video of the incident, then turns to Plaintiff's and Defendants' conflicting version of events.

1.    **Video**

The video Defendants submitted in support of their summary judgment motion provides a partially obstructed view of the July 22nd incident because there is a stairway in between the camera and Plaintiff's cell that cuts diagonally through the screen. (See Video; doc. no. 51, p. 18.) There is no audio recorded on the video. The video starts with Defendant Mosley walking into the frame in the direction of Plaintiff's cell, then turning away from Plaintiff's cell, speaking into a shoulder-mounted radio, and walking out of the frame from the 12 to 16 second mark. (See Mosley Aff. ¶¶ 3-4.) Plaintiff's cell door is closed at this point, and has a narrow vertical window which CCDC officials can presumably see through, though the video does not provide a clear view of any events through the window. At the 20 second mark, Defendant Mosley walks back towards Plaintiff's cell door. Defendant Mosley's hand is seen hitting the front of Plaintiff's cell door as though she is attempting to communicate with Plaintiff, but any view of Defendant Mosley's body is obstructed by the stairwell at this point. Defendant Mosley walks away from Plaintiff's cell and out of the frame again at the 38 second mark, and another inmate is seen walking out of a neighboring cell and away from the scene.

At the 1:06 mark, the neighboring inmate returns to his cell, two other inmates go up the stairs, and Defendant Mosley and another officer re-enter the frame, walking towards Plaintiff's cell. Defendant Mosley then walks away from Plaintiff's cell, while the other officer is seen peering through the window on Plaintiff's cell door. The officer walks away from Plaintiff's cell door at the 1:24 mark, at which time Defendant Mosley, another uniformed officer, and two plain-clothed officers[3] enter the screen. The plain-clothed officers and Defendant Mosely approach

---

[3] The officers in plain clothes were wearing navy blue t-shirts with "Columbia County Sheriff's Office" in yellow writing on the back, baseball caps, and khaki pants. Thus, these officers were readily identifiable as CCDC officials, though they were not in uniform.

Plaintiff's cell door, and one of the plain-clothed officers peers into Plaintiff's cell through the window. At the 1:39 mark, the plain-clothed officer turns away from Plaintiff's cell, points toward the cell door, and the group of officers appear to talk with each other.

At the 1:50 mark, another uniformed officer arrives, and all officers present and in view are facing Plaintiff's cell door, standing several feet back. At the 1:55 mark, a uniformed officer approaches Plaintiff's cell door, peers through the window, and appears to be attempting to speak to Plaintiff through the door until the 2:18 mark. That officer then backs away from Plaintiff's cell door, turns to the other officers present, and nods and speaks to them. At least one officer then approaches Plaintiff's cell door and the uniformed officer who nodded looks through the window again. The officer again steps back from Plaintiff's cell and nods and speaks to the group of officers.

At the 2:42 mark, officers open the door to Plaintiff's cell. Until the 2:51 mark, the cell door is only partially open, and there is no view into Plaintiff's cell. No officers enter Plaintiff's cell during this time. At the 2:51 mark, Plaintiff's cell door is opened fully, and Plaintiff's torso can be seen. Plaintiff is upright, standing near the doorway to the cell, and is holding his cane horizontally across his waist. At the 2:53 mark, an officer's hand can be seen reaching for the cane, but Plaintiff jerks his right hand back, pulling the cane out of the officer's reach. Over the next several seconds, several of the officers step closer to Plaintiff's cell. At this point, water can be seen covering the floor of Plaintiff's cell.

At the 3:08 mark, one of the plain-clothed officers and two of the uniformed officers enter Plaintiff's cell and make contact with Plaintiff. Plaintiff's cane is lifted into the air, though it is unclear whether Plaintiff lifted the cane of his own volition or if officers pushed Plaintiff's arms, holding the cane, into the air. The three officers and Plaintiff progress farther into Plaintiff's cell,

7

and Plaintiff's foot is seen coming off the ground. All officers present gather around Plaintiff's cell door, though it does not appear as though any additional officers enter Plaintiff's cell. At the 3:18 mark, one of the uniformed officers squats down, grabs Plaintiff by the ankle, and begins pulling him towards the door and out of the cell. At the 3:21 mark, Plaintiff's arms flail over his head as he attempts to grab the doorframe to the cell while being pulled out of the cell. The other uniformed officer who entered Plaintiff's cell appears to lean down to attempt to secure Plaintiff's arms, but the plain-clothed officer grabs the uniformed officer by the shoulders, switches places with her, and leans down to reach for Plaintiff's arms. The uniformed officer is then seen holding Plaintiff's cane, which she tosses to another uniformed officer several feet away. The officer catches the cane and walks out of frame, away from Plaintiff's cell, holding the cane.

At the 3:30 mark, the plain-clothed officer is leaning down in the doorway, and it appears Plaintiff is completely outside the cell on the ground, though the stairway blocks the view of the floor directly in front of Plaintiff's cell. At this point, it appears other officers began to assist the three officers who entered Plaintiff's cell in restraining Plaintiff. At the 3:35 mark, a uniformed officer drags Plaintiff by the ankle towards the neighboring cell, and two other uniformed officers are also by Plaintiff's feet attempting to restrain him. From the 3:36 mark to the 4:12 mark, several officers are using their bodies to keep Plaintiff down on the floor, though the stairway blocks any view of exactly what techniques are being used to restrain Plaintiff on the floor. At the 4:12 mark, the officers who were visible on the ground stand up and step away from Plaintiff, whose foot can be seen in the air at 4:14.

At the 4:22 mark, a uniformed officer crouches down near Plaintiff, presumably to assist with bringing Plaintiff to his feet. (See SMF ¶ 35.) At the 4:33 mark, a uniformed officer and a plain-clothed officer walk Plaintiff through and off the screen, with the plain-clothed officer

8

holding Plaintiff by the right arm and the uniformed officer holding Plaintiff by the left arm. Plaintiff's hands are handcuffed behind his back as he is escorted away from the cell and out of frame. There are no obvious injuries visible on Plaintiff's body as he is escorted away. At the 4:38 mark, the remaining officers leave the scene.

Water continues to rain down in Plaintiff's cell through the end of the video, which ends at the 6:24 mark.

### 2. Defendants' Version of Events

On July 22, 2021, Plaintiff used his cane to damage the sprinkler head on the ceiling of his cell. (SMF ¶ 19.[4]) Defendant Deputy Audrey Mosley saw water pouring from the ceiling of Plaintiff's cell and called Defendants Lieutenant Stanley Young and Deputy Travis Smith for assistance. (SMF ¶¶ 20-21.)

In addition to Lieutenant Young and Deputy Smith, Defendant Deputy Leslie Miller and non-parties Deputy James E. Maple, Jr., Deputy Melissa Reynolds, and Staff Sergeant Hugh Williams[5] also responded to the incident. (Miller Aff. ¶ 3; doc. no. 51-7, "Maple Aff.," ¶¶ 3-4; doc. no. 51-8, "Reynolds Aff.," ¶ 3; doc. no. 51, p. 3.) When CCDC officials approached Plaintiff's cell, Plaintiff was standing in "an aggressive fighting stance" with his cane in his hands. (SMF ¶ 22.) The officers on the scene verbally commanded plaintiff to put the cane down for safety purposes, but Plaintiff refused to comply with these instructions. (SMF ¶¶ 23-25.)

Deputy Miller, Deputy Smith, and Staff Sergeant Williams then entered Plaintiff's cell to

---

[4] The Court notes a typographical error in that paragraph 19 of Defendants' SMF states Plaintiff broke the sprinkler head on July 22, 2022. However, a review of the cited affidavits confirms this event took place in 2021. (See Mosley Aff., ¶ 3; Young Aff., ¶ 3; Smith Aff., ¶ 3.)

[5] Defendants' briefing describes Staff Sergeant Williams' involvement in the July 22nd incident, (see doc. no. 51, pp. 3, 13, 20), but the record includes no statement from Williams, nor do any other CCDC officials refer to Williams in their affidavits.

9

gain control of Plaintiff. (SMF ¶ 26.) Plaintiff resisted the officers' efforts to remove the cane from his hands, and officers took Plaintiff to the floor to secure Plaintiff's cane. (SMF ¶ 27.) With Deputy Miller's assistance, Deputy Smith took the cane from Plaintiff. (SMF ¶¶ 28.)

Once the cane was secured, officers sought to remove Plaintiff from his flooding cell. (SMF ¶ 29.) Plaintiff resisted officers' attempts to remove him from the cell and handcuff him. (SMF ¶ 31.) Lieutenant Young and Deputy Mosley pulled Plaintiff out of the cell by his legs and Deputy Mosley was ultimately able to place handcuffs on Plaintiff. (SMF ¶ 32; Young Aff. ¶ 9.) Once handcuffed, Lieutenant Young and Deputy Smith assisted Plaintiff to his feet and escorted him to C-Max housing without further incident. (SMF ¶ 35.)

At no point during the incident did Defendants or any other CCDC officials "throw the plaintiff to the ground, punch the plaintiff, kick the plaintiff in the head, or carry him by handcuffs." (SMF ¶ 42-43.) No officer observed any injuries to Plaintiff during or after the incident. (SMF ¶ 40.) Immediately after the incident, medical staff at CCDC evaluated Plaintiff. (SMF ¶ 39.) Medical staff did not observe any injuries to Plaintiff. (Doc. no. 51-2, "Thompson Aff.," p. 3.)

Plaintiff's medical records from CCDC reflect he was seen on July 22nd but reflect no documentation of injuries to Plaintiff. (Thompson Aff., p. 4.) Rather, the note written by Nurse Thompson provides:

> RECIEVED [sic] CALL THAT [Plaintiff] WAS MOVED TO CMAX FOR BUSTING A SPRINKLER HEAD AND WAS TALKING OUT OF HIS HEAD. UPON ARRIVAL TO CMAX, PT WAS SITTING ON SIDE OF BED. TALKING FAST. WRITER ASKED [Plaintiff] WHAT HAPPENED AND WHY HE WAS MAKING ODD COMMENTS TO THE HOUSING DEPUTIES. PT STATES "I WANTED TO SPEAK TO THE SUPERVISORS AND NOW I CAN".

(Id.) The next note in Plaintiff's medical chart, dated July 24, 2021, states: "CALL FROM OFFICER THAT [Plaintiff] WAS WALKING AROUND AND FELL ONTO HIS 'BUTT'.

WILL CHECK IN [A.M.] AS OFFICER STATED NO INJURIES NOTED." (Id.) On November 9, 2021, Plaintiff's medical chart reflects that he had an appointment with medical staff, but there was no documentation of any particular complaint or ailment. (Id. at 5.) On January 10, 2022, Plaintiff was seen by medical staff for a sick call request and the notes associated with that appointment state, "SEVERE PAIN LEFT SHOULDER SINCE JULY 2021." (Id.)

### 3. Plaintiff's Version of Events

As discussed previously, the July 22nd incident took place while Plaintiff was hallucinating due to the medication he was provided on July 21st. (SMF ¶¶ 12, 14, 16.) Although Plaintiff was experiencing "a total blank" and does not recall the incident, (SMF ¶¶ 17-18), his sworn deposition testimony provides his version of events, (see Gillespie Dep., pp. 34-52).

After Plaintiff stopped hallucinating from the medication he was given on July 21, 2021, he noticed pain and bruising on his body. (Id. at 36.) Plaintiff also noticed injuries to his arms and legs, one missing tooth, and another loose tooth which "eventually fell off," though it is unclear when Plaintiff first noticed these injuries. (Id. at 37.) Plaintiff began "investigating" what happened during the five to seven days he hallucinated to determine the source of his injuries. (Id.)

During Plaintiff's investigation, CCDC officers explained to Plaintiff that his arms had been "handcuffed behind [him] and [his] hands were touching the back of [his] head," which Plaintiff believed accounted for the pain in his arm. (Id. at 37-38.) Months after the incident, a fellow A-Pod inmate named Reddick further informed Plaintiff that he observed the July 22nd incident, saw "a female guard that was swinging on [Plaintiff], a male guard that was kicking and punching," and was told to go outside.[6]

---

[6] The Court includes Plaintiff's recounting of inmate Reddick's statements only for the sake of completeness, but notes these statements are inadmissible hearsay to the extent they are presented to establish CCDC officials' actions during the July 22nd incident. See Fed. R. Evid. 801-02. Thus, these

11

Part of Plaintiff's version of the event arises from his viewing of the video of the incident. (Id. at 44.) According to Plaintiff, the video depicts CCDC officials kicking and punching Plaintiff after he was on the ground and his cane had been secured, while other officers stood and watched. (Id.) Plaintiff further describes the video as showing an "officer swinging on [Plaintiff] and [an]other officer kicking [Plaintiff] and . . . beat[ing] the cane on the wall until it bent." (Id. at 39.)

Plaintiff does not personally recall any of the events related to the July 22nd incident. (Id. at 43-44.) He does not know which of the CCDC officials he sued took any actions he alleges. (Id. at 44-45.) Plaintiff alleges injuries including missing teeth, shoulder injuries requiring surgery, bruises on his leg that have not healed, and injuries to his left leg as a result of the July 22nd incident. (Id. at 45-50.)

### III.   DISCUSSION

#### A.   Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

---

statements fall within "[t]he general rule [] that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.1990)). Moreover, as Plaintiff knows nothing more about inmate Reddick than his last name, (see Gillespie Dep., pp. 41-42), it is unlikely these statements would be "reduced to admissible form" at trial. Macuba, 193 F.3d at 1323; Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012) ("The possibility that unknown witnesses will emerge to provide testimony on this point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial."); see also Geter v. Schneider Nat'l Carriers, Inc., No. 22-11285, 2023 WL 7321610, at *4 (11th Cir. Nov. 7, 2023) ("[O]n this point, Geter's testimony is inadmissible hearsay, as there is nothing in the record to indicate that her statement would lead to admissible evidence at trial. Therefore, we do not consider this portion of Geter's testimony.").

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*).  On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id. at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

> **B.    Defendants Are Entitled to Summary Judgment Because the Record Evidence Establishes the Force Used by Defendants Was Not Objectively Unreasonable**

Plaintiff's excessive force claim arises under the Due Process Clause of the Fourteenth Amendment and requires him to show "that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015); see also Patel v. Lanier Cnty. Ga., 969 F.3d 1173, 1181 (11th Cir. 2020).  Whether the application of force was objectively reasonable is a fact-specific inquiry and cannot be evaluated in a "post-hoc fashion or 'with the 20/20 vision of hindsight.'" Piazza v. Jefferson Cnty., Ala., 923 F.3d 947, 953 (11th Cir. 2019) (quoting Kingsley, 576 U.S. at 397).  A list of non-exhaustive "[c]onsiderations in determining the reasonableness of force include: the relationship between the need for force and amount used; the extent of the injury; efforts made by the officer to limit the amount of force; the severity of the security problem; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Mathews v. Wetherbee, 839 F. App'x 395, 397 (11th Cir. 2020) (*per curiam*) (citing Kingsley, 576 U.S. at 397).  In the jail context, "[a] court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" Kingsley, 576 U.S. at 397 (quoting Bell v. Wolfish, 441 U.S. 520, 540, 547 (1979).

Here, all the Kingsley factors support a finding that no reasonable juror could find the force used against Plaintiff was objectively unreasonable in light of the admissible evidence presented.  Defendants were faced with an inmate who was, by his own admission, hallucinating, was refusing to comply with verbal commands, had broken a sprinkler head

14

which caused ongoing flooding in his cell, and was holding a cane, which officers reasonably believed could be used as a weapon and had already been used to cause damage to CCDC facilities. (SMF ¶¶ 16, 19-20, 23-25, 29.) Defendants needed to remove Plaintiff from his cell to allow maintenance staff access to repair the broken sprinkler head and control the flooding. (See SMF ¶ 21.) In an attempt to limit the amount of force used, Defendants provided a number of verbal commands to Plaintiff, and Plaintiff refused to comply. (SMF ¶¶ 23-25.) After Plaintiff refused to comply, CCDC officials, including Defendants Miller and Smith, entered Plaintiff's flooded cell and applied hands-on force to Plaintiff to remove the cane from his hands and remove him from the cell. (SMF ¶¶ 26-29.) Plaintiff continued to resist after being removed from his cell. (SMF ¶¶ 31-32.) Once Plaintiff was handcuffed, he was brought to his feet, no further force was applied, and Plaintiff was escorted away from his cell and evaluated by medical staff. (SMF ¶¶ 32, 35.)

The Court has considered Plaintiff's sworn deposition testimony describing the force he contends Defendants used against him and the injuries he contends he received during the July 22nd incident. (See Gillespie Dep.) The information contained therein is squarely contradicted by the records submitted in support of Defendants' summary judgment motion such that Plaintiff's version of events is implausible and should not be accepted by the Court. See Scott, 550 U.S. at 380. Specifically, Defendants' affidavits and Plaintiff's medical records squarely contradict the extent to which Plaintiff claims he was injured. (Compare Gillespie Dep., pp. 36-37, 45-51, with Thompson Aff., pp. 4-5; SMF ¶¶ 39-41.) "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380. While credibility

15

determinations and the weighing of evidence is for the jury, Plaintiff "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Varazo v. Keiser Corp., No. 116-CV-4228, 2018 WL 2938871, at *2 (N.D. Ga. June 12, 2018) (citing Scott, 550 U.S. at 380). "[I]f the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict," summary judgment should be granted. Id.

Moreover, Plaintiff admits he does not recall the July 22nd incident at all, (Gillespie Dep., pp. 43-44), and he "submitted no testimony or other evidence (other than h[is] own hearsay statement) . . . in opposition to the defendants' motion for summary judgment," Morrison v. City of Atlanta, 614 F. App'x 445, 448 (11th Cir. 2015) (*per curiam*). "Unsupported, conclusory allegations that a plaintiff suffered a constitutionally cognizant injury are insufficient to withstand a motion for summary judgment." Howard v. Memnon, 572 F. App'x 692, 695 (11th Cir. 2014) (*per curiam*) (citing Bennett v. Parker, 898 F.2d 1530, 1532-34 (11th Cir. 1990)); see also Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) ("[O]ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial."). Even drawing all justifiable inferences in Plaintiff's favor, his version of events "is so utterly discredited by the record that no reasonable jury could" believe him. Scott, 550 U.S. at 380. As such, the Court concludes Defendants have met their burden of showing the absence of evidence to support Plaintiff's claims, entitling them to judgment as a matter of law.

### C. Defendants Are Entitled to Summary Judgment on Plaintiff's Failure to Intervene Claim

To the extent Plaintiff "alleges claims for failure to intervene against the various

officers who arrived at the cell and watched while other officers attempted to restrain [Plaintiff], those claims also must fail." Ireland v. Prummell, 53 F.4th 1274, 1301 (11th Cir. 2022). "[A] claim for failure to intervene requires an act of excessive force by the perpetrating officer in the first instance . . . ." Id. (citing Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)). Because Plaintiff's excessive force claims fail as a matter of law, so must his claims for failure to intervene.

### D. Defendants' Argument Regarding Immunity Is Moot

Defendants argue they are entitled to qualified immunity. (Doc. no. 51, pp. 6-9, 19-21.) Because Defendants are entitled to summary judgment on the substantive merits of Plaintiff's claims as discussed *supra*, the issue of immunity is ultimately moot, and the Court will not address it. See Martinez v. Burns, 459 F. App'x 849, 851 n.2 (11th Cir. 2012) (*per curiam*).

### IV. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED**, (doc. no. 50), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 7th day of February, 2024, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA